## MONTCLAIR SAVINGS BANK

*v.*

## CORNELIA M. PARTRIDGE and CHARLES R. PARTRIDGE, her husband, GEORGE E. PAUL, EDWIN M. FARRIER, HUDSON COUNTY NATIONAL BANK OF JERSEY CITY, LORENZO E. WOODHOUSE, executor of Charles F. Mathewson, deceased, and BENJAMIN S. HARMON.

[Argued June 16th, 1919. Decided September 13th, 1920.]

1. The grantee under a deed absolute in form, but given as security, though under obligation to the grantor not to convey the property in violation of the grantor's right to reconveyance, is not a trustee for the grantor to the extent of being prevented from purchasing the property free of any claim of the grantor at a sale under foreclosure of a prior mortgage.

2. Evidence being examined, *held*, that the conveyance in question was made to secure a creditor, and was not a conveyance in trust for the grantor.

3. Evidence being examined, *held*, that the conveyance in question was made to secure notes of the grantor held by the grantee, and not to secure the execution of a syndicate agreement, executed before the conveyance was made.

4. A grantee under a deed absolute in form but really given to secure certain notes, who purchased, while some of the notes remained unpaid, the property conveyed at a sale on foreclosure of a prior mortgage, acquires absolute title to the property against the grantor and her assigns, who were parties to the foreclosure suit.

5. A subsequent encumbrancer can protect his interests by paying the amount of the prior mortgage after sale on foreclosure to the mortgagee, and taking an assignment of his bid. The sheriff's deed to him conveys full title.

6. A subsequent encumbrancer who assumed the debt secured by the prior mortgage is bound to protect the owner against any liability on the prior mortgage, but is not bound to protect the equity under the prior mortgage for the benefit of the owner.

On counter-claim.

*Mr. Richard Boardman* and *Mr. Francis* (of the New York bar), for the counter-claimants Woodhouse, executor of Mathewson et al.

*Mr. Charles L. Carrick,* for the defendants George E. Paul, Edwin M. Farrier and the Lincoln Trust Company.

*Mr. Robert J. Bain* (*Collins & Corbin*), for the Hudson County National Bank of Jersey City.

STEVENSON, V. C.

The sole controversy to be disposed of in this cause is presented by the counter-claim of Woodhouse, executor of Mathewson et al., and the answer thereto of the Lincoln Trust Company. Although the view which I take of the controlling facts in this case will, I think, enable me to exclude from consideration a large part of the mass of testimony and exhibits which constitute the evidence in this cause, nevertheless, some statement of the history of the transactions to be dealt with seems to be necessary. A narration of the important facts for the purposes of this case may best be made, I think, by following their chronological order.

In 1912, the defendant Mrs. Cornelia M. Partridge owned a house and lot in Montclair, New Jersey, which was occupied by herself and her husband, the defendant Charles R. Partridge, as a residence. The property was subject to a mortgage for $10,-000 held by the Montclair Savings Bank, which institution still appears as the nominal complainant in this cause, although its interest has long since been satisfied. This mortgage was on the

property when Mrs. Partridge acquired it. The argument of this cause has been made upon the assumption that Mrs. Partridge assumed the payment of the mortgage and therefore was liable for the amount thereof.

We may assume, I think, that the value of Mrs. Partridge's equity did not exceed $8,000. Mr. Farrier, the president of the Lincoln Trust Company, testifies that he and Mr. Partridge, who acted for his wife in all this business as her plenary agent, agreed upon this sum as the value of the equity. There is no satisfactory evidence that the equity was more than $8,000, and the indications are quite positive that when the property came to be sold by the sheriff the value of the equity was substantially below that figure. Subsequently, the purchaser from the sheriff, the Lincoln Trust Company, sold the property for $16,000.

Mr. Partridge was the president of the Charles R. Partridge Lumber Company, a corporation located and doing business in Hudson county, New Jersey, which was adjudged a bankrupt on July 2d, 1912. The Lincoln Trust Company held $18,600 of notes on which Mrs. Partridge appeared as maker, each note stating, in substance, that her separate estate was thereby charged. In fact, Mrs. Partridge was probably a mere accommodation party, the notes having been discounted for the benefit of the Partridge Lumber Company. The indications are that Mrs. Partridge was also under large obligations, in form, at least, upon other paper of the Partridge Lumber Company held by other banks.

However this may be, Mr. Partridge went to his friend Mr. Edwards, the president of the First National Bank of Jersey City, and called upon him for help, stating that Mrs. Partridge "had this property in Montclair and was about to lose it." It will be observed at the start that this whole transaction which we are to investigate, originated in an effort on the part of Mr. Partridge to have this valuable property placed in friendly hands so that the creditors of the Partridge Lumber Company and of himself and his wife could not reach it. Mr. Partridge corroborates Mr. Edwards in explaining the object of the arrangement which he made, or undertook to make, with Mr. Edwards. He testifies:

"We thought we were going to lose the property.

"*Q.* In what way?

"*A.* Well, they would take it away from us. They would attack the endorsers on this paper and take the property away from us, and my idea was to turn it over to Mr. Edwards in trust, and he said when the endorsers were relieved that would relieve Mrs. Partridge, of course, and the property could be returned."

Mr. Partridge makes no effort to conceal the fraudulent purpose which he sought to accomplish. He admits that he feared that a judgment would be recovered against Mrs. Partridge, and that the property would be sold. He anticipated that there would be judgments amounting to four times the value of the property. As a matter of fact, within a week after Mr. Partridge's interview with Mr. Edwards, and his subsequent deal with Mr. Farrier, the Hudson County National Bank, in a suit then pending, after striking out Mrs. Partridge's plea as a sham plea, entered judgment against her for over $17,000, which sum was about twice the value of the equity.

Mr. Edwards told Mr. Partridge that he could not take the property in payment or for the security of the claims of his bank because he did not have any notes of Mrs. Partridge or bearing her endorsement, and he informed him that Mr. Farrier (the Lincoln Trust Company) had such notes. The result was that Mr. Farrier was called up and brought into the transaction. Whether he was made acquainted with all that had passed between Mr. Partridge and Mr. Edwards does not appear. It is quite plain, however, that Mr. Farrier represented his bank only, and while, presumably, intending to be just and fair he was looking out for the interests of his bank. Mr. Partridge forthwith consulted his counsel, Mr. Goldenhorn, who testified that both Mr. and Mrs. Partridge were his clients. Mr. Goldenhorn, in pursuance of instructions from Mr. Partridge, thereupon drew a deed bearing date July 31st, 1912, recorded August 3d, 1912, purporting to convey from Mr. and Mrs. Partridge to one George E. Paul the Montclair property of Mrs. Partridge. At the end of the description appears a brief clause as follows:

"Subject to a mortgage for the sum of ten thousand dollars held by the Montclair Trust Company, bearing interest at the rate of five per cent., which said party of the second part assumes."

It is a somewhat remarkable fact that no party to this deal appears to have known at the time that the deed contained this covenant of assumption. There is not the slightest evidence that any agreement between Mr. Partridge and Mr. Edwards, or Mr. Partridge and Mr. Farrier in any way provided for the assumption of the mortgage. Mr. Goldenhorn was not interrogated in regard to the matter. Mr. Farrier thinks that the clause was inserted by a mistake by copying some other deed, but this suggestion is entitled, I think, to very little weight. The presumption, it seems to me, is that Mr. Goldenhorn, recognizing that the instrument was in form an absolute deed and might in the future stand as such, very properly required the grantee to assume the outstanding mortgage. If the instrument was used in accordance with what Mr. Goldenhorn knew was the intention of the parties, as a mere security either absolute or conditional for certain notes, the covenant of assumption would do the grantee no harm, but if by forfeiture, or otherwise, the instrument was used in the future as a deed to save the expenses of a foreclosure, the covenant of assumption would have its just and proper force according to its terms. There is no dispute between the parties that in fact the deed which recites a consideration of "the sum of one dollar and other considerations" was intended as a mere security. The dispute between the parties is as to what was the nature and scope of the security affected, or intended to be affected, by the deed. When the deed was delivered, apparently on August 3d, 1912, Mrs. Partridge and Mr. Farrier, acting for the Lincoln Trust Company, signed a paper which Mr. Farrier himself drew. This paper recites that Mrs. Partridge had "sold" to the Lincoln Trust Company the property, and then proceeds as follows:

"Whereas, the said party of the second part, for the better protection of its interests, requires that the said promissory notes be held in escrow for a period of time to be determined or until certain matters now pending are settled. It is hereby agreed by the party of the first part, that she will place the aforesaid promissory notes in possession of Raymond Dawson, whose address is 1 Exchange Place, Jersey City, to be held by him until the settlement of the above-mentioned actions or until mutually agreed upon by both parties to this agreement."

Below the signatures of the parties appears a note or memorandum in the handwriting of Mr. Farrier, setting forth the dates and amounts of three notes of Mrs. Partridge, aggregating $8,000. This incomplete and somewhat unintelligible so-called agreement was thereupon, together with the three notes referred to, deposited with Mr. Dawson, who produced the papers for the purposes of this trial. It may be noted that the notes are the same in form, all payable to the Charles R. Partridge Lumber Company and signed by Mrs. Partridge, containing the clause attempting to charge her separate estate, and all three notes were discounted by the Lincoln Trust Company for the benefit of the Partridge Lumber Company.

The claim which has been referred to as that of Woodhouse et al. originally was held by a New York firm composed of Benjamin S. Harmon and Charles F. Mathewson, both of whom are dead, and are now represented in this suit by their respective executors. The devisee of Mr. Harmon is also made a party. The instrument under which Messrs. Harmon and Mathewson claimed to have acquired an interest in the Montclair property reads as follows:

"BENJAMIN S. HARMON AND CHARLES F. MATHEWSON,

"55 Wall Street, New York.

"DEAR SIRS---In consideration of your endorsement of the note of my son Wallace H. Partridge, dated May 21st, 1913, to himself for $5.500, I hereby assign and transfer to you all my right, title and interest in the premises at which I am now living in Montclair, New Jersey.

"The title to said premises has been transferred by me to George E. Paul as security for and until certain obligations against my husband, Charles R. Partridge, and myself as endorser are discharged; and I direct the holder of said title thereupon to deed said property to Charles F. Mathewson (or in case of his decease to Benjamin S. Harmon), to be held and disposed of to secure them upon the endorsement of the above-mentioned note and their endorsements upon any other notes of my son Wallace H. Partridge as now existing, and any renewals or extensions of said notes or any thereof or any part of said note or notes, with full power of sale to said Mathewson or Harmon as grantee to dispose of said property at any time as they may see fit and appropriate the proceeds to the payment of such obligations or any thereof or the reimbursement of said Harmon or Mathewson or either thereof for any payments which they may have made thereon.

"Any surplus in case of such sale will be returned to me after all such obligations have been discharged and any expenses in that connection paid and retained by such grantee.

"IN WITNESS WHEREOF, I have hereunto set my hand and seal this 26th day of May, 1913.

"(Signed)          CORNELIA M. PARTRIDGE."

It may be observed that there is not the slightest reference to any trust or any fiduciary relation of any kind existing between Mrs. Partridge, on the one hand, and Mr. Paul or Mr. Farrier or the Lincoln Trust Company on the other hand. The instrument sets forth that Paul holds title "as security for and until certain obligations against my husband, Charles R. Partridge, and myself as endorsers are discharged." It is evident that there was nothing in the mind of the parties to this instrument inconsistent with the conviction that Mr. Paul held a mere mortgage in the common form of an absolute deed to secure the discharge of Mr. and Mrs. Partridge from their obligations. The discharge of these obligations would necessarily involve the satisfaction of the three notes above mentioned, aggregating $8,000. The language of the assignment, however, does not indicate that the deed stood as security only for the $8,000 of notes.

The claim of the Hudson County National Bank arises from the judgment heretofore referred to which it recovered on August 6th, 1912, against Cornelia M. Partridge and Charles R. Partridge for the sum of $17,113.75, being the amount of certain promissory notes on which the Partridges were liable. The suit in which this judgment was recovered was commenced July 15th, 1912, and was therefore pending at the time when Mr. Partridge sought help from Mr. Edwards and immediately thereafter made the conveyance to Mr. Paul.

In order to understand the controversy between Woodhouse et al., executors, on the one hand, and the Lincoln Trust Company on the other, a brief description of a situation which is disclosed by a vast mass of testimony and exhibits is necessary. The creditors of the Partridge Lumber Company consisted largely of banks. These banks were negotiating, in 1912, for the purchase of the assets of the Partridge Lumber Company from its trustee in bankruptcy, with the expectation that they could handle these assets in such a way as to get back their new investment and a

large part, if not all, of their claims against the Partridge Lumber Company. After some negotiation the banks contributed $127,000, and therewith bought these assets and had them vested in a new corporation called the Inter-State Lumber Company. I do not think it necessary to go further into the history of the complications which followed in which one Cheeny and the South Georgia Lumber Company took part. No doubt the banks, including the First National Bank, of which Mr. Edwards was president, and the Lincoln Trust Company, of which Mr. Farrier was president, negotiated for a considerable time before a sort of syndicate agreement was made providing for the contribution of the money for the purchase of the assets of the lumber company and the distribution of notes of the new corporation to the various parties interested.

With the foregoing facts in view I think that the statement of the conflicting views of the two parties now in this litigation, Woodhouse et al., executors, and the Lincoln Trust Company, may well be deferred until the manner in which these claims have been presented is set forth.

Mrs. Partridge appears to have remained for some period of time occupying the Montclair property. The Lincoln Trust Company from time to time paid the interest on the mortgage of the Montclair Bank, and I think also the insurance premiums. The Lincoln Trust Company also paid taxes, I think, although, perhaps, that was not until after the foreclosure sale.

On July 19th, 1915, the Montclair Savings Bank filed the bill in this cause to foreclose its mortgage, making Mr. and Mrs. Partridge, George E. Paul, Edwin M. Farrier, Hudson County National Bank of Jersey City, Benjamin S. Harmon and Lorenzo E. Woodhouse, executor of the estate of Charles F. Mathewson, deceased, defendants.

On August 27th, 1915, the Hudson County National Bank filed an answer and a counter-claim. The counter-claim charged that the conveyance from Mr. and Mrs. Partridge to Mr. Paul was made with intent to hinder, delay and defraud the defendant "from recovering the amount due in satisfaction of" its judgment, and prayed that the deed from the Partridges to Paul, and a later deed from Paul to Farrier, be decreed to be void and

of no effect, and that its judgment be decreed a lien on the Montclair property. This counter-claim, and the pleadings filed in reply thereto, may be disregarded because by an order of this court bearing date December 24th, 1917, consented to by the parties interested, the counter-claim of the Hudson County National Bank was dismissed and thereby this bank disappeared from the present litigation.

An answer and counter-claim was also filed on behalf of Woodhouse et al., the counter-claim being presented against George E. Paul, Edwin M. Farrier and "the Lincoln Trust Company, a corporation of the State of New Jersey, a third party." The object of this counter-claim was to secure a reconveyance of the Montclair property to Mrs. Partridge and to compel the payment of the mortgage for $10,000 by Mr. Paul. Inasmuch as the answers did not set up any defence to the complainant's mortgage, on the 16th of October, 1915, an order of reference to a master was made in the usual form. To this order, however, the chancellor added a provision that the "questions raised in the answers and counter-claims of the answering defendants" were reserved.

The master having reported in the usual form the amount due to the complainant, a final decree was thereupon made dated November 9th, 1915, ordering sale to be made of the mortgaged premises, the Montclair property, for the satisfaction of the mortgage debt ($10,458.75) with complainant's costs of suit. The property was thereupon advertised under the *fi. fa.* according to law and was sold by the sheriff of Essex county for a consideration recited as $7,500 to the Lincoln Trust Company of New Jersey. The sheriff's deed bears date January 22d, 1916, and was recorded February 24th, 1916. The sheriff's deed recites that the property was struck off for said sum ($7,500) to the Montclair Savings Bank, and then further recites an assignment of the bid by the Montclair Savings Bank to the defendant the Lincoln Trust Company, the conveyance then being made to the last-named company. The Lincoln Trust Company paid the Montclair Savings Bank the full amount of its decree and costs. Shortly after receiving title, in the spring of 1916, the Lincoln Trust Company sold the property for $16,000, as hereinbefore stated.

When the answers and counter-claims were filed the parties had an equity in view over and above the mortgage of the Montclair Savings Bank, and when the cause was referred in the usual way to a master so that prompt sale was practically inevitable, no doubt the parties contemplated the transfer of their claims from the land, the equity of redemption, to a possible or probable surplus that would be paid into court. As a matter of fact the equity of redemption was foreclosed and no surplus materialized, no bidder being found willing to pay the amount due the complainant, the Montclair Savings Bank, on its mortgage.

In this situation of affairs, on May 16th, 1916, the cause was referred to me as vice-chancellor "to hear the same for the chancellor upon all questions reserved in the order of reference to the matter heretofore made in this cause, and all questions raised on the amended pleadings."

The retirement of the Hudson County National Bank from the cause upon the disappearance of the equity of redemption in the land, and the non-appearance of any surplus representing such equity, left as the only litigants in respect of the above-mentioned reserved matters, Woodhouse et al. as actors and the Lincoln Trust Company as defendant. The contentions of these parties *inter sese* are exhibited in a number of pleadings in the nature of counter-claims and answers and amendments and supplements thereto.

While under the order of reference the hearing before me is confined to the questions reserved and to "all questions raised on the amended pleadings," it would seem that counsel for Woodhouse et al. has undertaken to litigate some matters beyond the scope of the reservations. It is worth while to note that when the order of reference to me was made in order that the reserved matters might be determined, the mortgaged premises had been sold, the sale had been confirmed, and the proceeds of such sale had proved insufficient to satisfy the mortgage debt so that there was no surplus. And further, it may be noted, that no attack upon the sale or attempt to open it has ever been made. Ordinarily, counter-claims in a foreclosure suit introduce litigations between defendants in respect of the equity of redemption, and if, as is often the case, there being no defence to the complainant's

foreclosure, the mortgaged premises are sold pending the determination of the defendant's claims *inter sese,* those claims attach to the surplus money. If there is no surplus money, ordinarily, the functions of the counter-claims expire.

In this present case a perusal of the pleadings which exhibit the reserved matters seems to show that a great deal of what has been litigated before me was not, and could not, have been contemplated when these pleadings were filed. A large part of the testimony and argument before me relates to matters which arose after the sale of the mortgaged premises had been effected and the fact established that there was no surplus money. All of the matters calling for consideration might well have been presented to the court in an original suit brought by Woodhouse et al. In the last phase which the contention of these defendants presented before me the resale of the mortgaged premises by the Lincoln Trust Company appears as an important fact, and it is argued that the Lincoln Trust Company must be adjudged to have held the land in trust for these counter-claimants and that as trustee it should account for its profit. These seem to be matters rather far removed from the scope of the reservations and altogether foreign to the original foreclosure suit. It is true, however, that Messrs. Woodhouse et al. originally set up that the Lincoln Trust Company held the equity in this property in trust for them, and they now claim that when the Lincoln Trust Company acquired title to the property under the sheriff's sale they took the same practically upon the original trust. How far this fact sustains the propriety of this somewhat peculiar course of pleading I shall not undertake to determine. No question as to the form or sufficiency of these pleadings has been raised on either side. I shall endeavor to dispose of the matters in contention between the parties which were the subject of protracted arguments and voluminous briefs without much reference to the pleadings. Counsel for Messrs. Woodhouse et al. at the close of the case undertook to found a claim against the Lincoln Trust Company, based on the allegation that it had been guilty of fraud in preventing Messrs. Woodhouse et al. from protecting their rights at the sheriff's sale. This claim is not in any way suggested in the pleadings, and it certainly would be strange to allow it to be

brought into this foreclosure suit. The proposition that a defendant in a foreclosure suit after the sheriff's sale can file a counter-claim or amended counter-claim against a co-defendant setting up that the co-defendant had fraudulently prevented him from protecting himself at the sheriff's sale and have such claim litigated in the foreclosure suit is, I think, a novelty in equity practice and pleading.

1. At first, Woodhouse et al., the representatives of the estate of Mathewson and Harmon, claimed that the Lincoln Trust Company should be required to perform its covenant to assume and pay the mortgage for $10,000, and then convey the land free from that mortgage to the defendant Benjamin S. Harmon, survivor of Mathewson and Harmon, who would thereupon hold the same primarily for indemnification on account of the endorsement above mentioned, and secondarily, for the benefit of Mrs. Partridge. This extreme claim subsequently was abandoned and the concession was made that the Lincoln Trust Company should be deemed subrogated to the rights of the Montclair Savings Bank as mortgagee. In the progress of the suit when the fact was disclosed that the Lincoln Trust Company had sold the property for $16,000, counsel for Woodhouse et al. defined their claim as the right to have an accounting from the Lincoln Trust Company, in which that company should account for the profit it made on sale of the property, and the usual method of accounting should be pursued in respect of taxes, rents, &c. This theory puts the Lincoln Trust Company in the position of a trustee who must be charged with having bought the property for the benefit of a *cestui que trust.*

The fundamental proposition upon which Woodhouse et al. base their claim that the conveyance originally made to Mr. Paul created him a trustee for Mrs. Partridge, in my judgment, is without support in the evidence. A mortgagee is not a trustee. When a man accepts a deed absolute in form which in fact is a mortgage, he is in one sense a trustee—a dry trustee. There are, however, no elements of trust or confidence in the affair further than this · that the grantor-mortgagor confides in the grantee, mortgagee, in that he makes him appear as the absolute owner of the property and thereby clothed with power to convey.

The present case is singularly destitute of any circumstances indicating a fiduciary relation between Mrs. Partridge and Mr. Paul, or his principal, the Lincoln Trust Company. Mr. Partridge, acting for his wife, anticipating a judgment for over $17,-000 against her which would sweep the property from her, appealed first to the First National Bank of Jersey City and his friend Mr. Edwards, the president of that bank, offering the property to the bank as security with a right of redemption in order to protect the property from the pursuing creditor. Undoubtedly, at this time, Mr. Edwards and Mr. Farrier and the other bank presidents, optimistically expected that the deal they were making for the purchase of the assets of the Partridge Lumber Company, would result in the payment of the entire Partridge Lumber Company indebtedness for a large portion of which Mrs. Partridge stood nominally liable. Inasmuch as Mr. Edwards' bank did not hold paper upon which Mrs. Partridge was liable, he turned his friend over to Mr. Farrier. The evidence does not distinctly show that the design of Mr. Partridge, which was fully exposed to Mr. Edwards, was communicated to Mr. Farrier. How much Mr. Farrier knew of the real motive actuating Mr. Partridge as the representative of his wife, we are not informed. The fact, however, is distinct and plain that Mr. Farrier entered into no fiduciary relation with Mrs. Partridge, except that which every man assumes who takes an absolute conveyance which in fact is a mortgage, obliging him as an honest man not to cheat the grantor-mortgagor by transferring his apparently absolute title to a stranger. Mr. Partridge betook himself after his conference with Mr. Edwards to his counsel, Mr. Goldenhorn, who represented him throughout the affair, drew the deed to Mr. Paul and examined the agreement drawn by Mr. Farrier and advised Mr. Partridge in regard to the right of redemption which Mrs. Partridge would have. In brief, the evidence in this case, in my judgment, presents the common instance of a deed absolute in form, given, however, as a mortgage to secure the payment of a sum of money, with a verbal understanding that upon payment of the money the land is to be reconveyed. Men frequently give deeds of this character with the idea that if the money is not paid the grantee will stand as the

absolute owner of the property and the expenses of a foreclosure suit will be saved. In this case the conveyance was made absolute in form, not in order to save the expenses of foreclosure, but to cover up the property where the creditors of the grantor who were rushing in with judgments would not be able to reach it. It is somewhat surprising that a grantor or assignee of a grantor should come into a court of equity seeking to enforce an alleged secret trust of this character.

2. Messrs. Woodhouse et al. claim that the bargain between Mr. Partridge, acting for his wife, and Mr. Farrier, acting for the Lincoln Trust Company, was that the land should be conveyed to Mr. Paul as the agent of the Lincoln Trust Company to secure the execution by the banks interested of a certain agreement providing for the purchase of the assets of the Partridge Lumber Company. In their counter-claim Messrs. Woodhouse et al. allege that

"if certain banks, creditors of the C. R. Partridge Lumber Company, should sign a certain contract, the negotiations for which were then pending, the said property should be reconveyed to the said Cornelia M. Partridge or her nominees."

The claim on the part of the Lincoln Trust Company is that the so-called trust agreement was that the conveyance should secure to the Lincoln Trust Company the discharge and satisfaction of Mrs. Partridge's obligations to the trust company, amounting to $18,600, and about two thousand dollars of notes which the Partridge Lumber Company had taken from its customers and transferred to the Lincoln Trust Company.

(1) It seems to me that it is highly improbable that Mr. Partridge would offer, or Mr. Farrier would accept, a security which would perform its full function and expire when the bankers' agreement should be signed and become operative. There is no pretence that upon the mere execution of this bankers' agreement Mrs. Partridge's nominal or actual obligations on the paper discounted by the Partridge Lumber Company would be discharged. Mr. Partridge would naturally seek to cover up his wife's property until all peril to her from judgments on these notes had passed away. On the other hand, the important fact

in the mind of Mr. Farrier was not the signature of the agreement by the banks but the accomplishment of its object, viz., the payment of the Partridge notes. It would, indeed, have been a strange result if in execution of the so-called trust alleged by Messrs. Woodhouse et al., Mr. Paul or Mr. Farrier upon the signature of the bankers' agreement had reconveyed the Montclair property to Mrs. Partridge and thereby had subjected it to the judgment for $17,000 recovered by the Hudson County National Bank.

(2) Mr. Robinson, an unimpeached and uncontradicted witness, testifies positively that the bankers' agreement had been executed by all the parties thereto and had become operative before June 27th, 1912, more than a month before the deed from Mr. Partridge to Mr. Paul was executed, and the agreement and notes were placed in escrow with Mr. Dawson.

(3) Mrs. Partridge made no claim for a reconveyance in the summer and winter of 1912, although she must have had notice that the agreement between the banks had been executed, but eleven months later she executed the assignment to Messrs. Harmon and Mathewson, in which she recites that Mr. Paul holds title "until certain obligations" of her husband and herself "are discharged." It is evident that Mr. and Mrs. Partridge understood when this assignment to Messrs. Harmon and Mathewson was executed that the title of the property was still held as security for the discharge of other obligations to the Lincoln Trust Company.

The natural interpretation of the transaction in question accords with the testimony of Mr. Farrier. Partridge was eager to put the property of his wife in friendly hands in order that she might have it back in case the banks by their venture, involving the investment of $127,000 of new money, should succeed in getting out of the assets of the defunct Partridge Lumber Company three or four hundred thousand dollars of indebtedness for a large portion of which Mrs. Partridge was apparently liable. On the other hand, Farrier was looking out for the interests of his bank and wanted to get as much security as possible for the Partridge paper which his bank held. Whether he had notice of the fraudulent motive of Mr. Partridge is not, I think, a matter

of importance, in view of the conclusion which I have reached. These men plainly under any view of the evidence worked up what in fact was a sham sale. There was no absolute sale. There was no surrender of the $8,000 of Mrs. Partridge's notes so as to discharge them. The notes were kept alive, and it was understood that the Lincoln Trust Company should receive all dividends on them in the bankruptcy proceedings or from the syndicate proceedings of the banks.

3. Whether the agreement was that the Montclair property should be held by Mr. Paul as agent for the Lincoln Trust Company to secure the $8,000 of notes, or to secure the entire amount of Mrs. Partridge's notes ($18,600) held by the Lincoln Trust Company, or to secure in addition the paper amounting to a little over two thousand dollars received by the Partridge Lumber Company from its customers and discounted by the Lincoln Trust Company, is not a question which we are obliged to solve. Undoubtedly, $8,000 of notes were selected as the consideration, or fictitious consideration, of a sale of the property, because that sum represented the full value of Mrs. Partridge's equity. Although the deed recites the consideration of "one dollar and other considerations," it is plain that Mr. Partridge could at all times boldly declare to the Hudson County National Bank of Jersey City and other judgment creditors that Mrs. Partridge had sold her equity for its full value paid by the Lincoln Trust Company by the surrender of the $8,000 of her promissory notes.

There is one consideration which I think strongly sustains Mr. Farrier's testimony, to the effect that the deed was accepted as security for the entire indebtedness of $18,600, plus the $2,000 of business paper. Mr. Farrier and the other bankers contemplated the *pro rata* payment of their claims, including the Partridge notes, through the operations of the Inter-State Lumber Company. Mr. Farrier, therefore, was not in a position to sever $8,000 of the Partridge paper which he held and accept a separate security for that amount. If he accepted the Montclair property as security for these particular notes, aggregating $8,000, in the course of time dividends might be paid on the Partridge paper, the application of which perhaps he could not control. Such dividends might reduce the $8,000 of notes to a

comparatively small sum, while a substantially greater sum would remain due on the other part of Mrs. Partridge's obligations. Both parties contemplated that all Mrs. Partridge's obligations to all the banks would probably be discharged in the near future. The natural and probable transaction was to make the Montclair property stand as security for all the obligations of Mrs. Partridge which the Lincoln Trust Company held.

4. The testimony of Mr. Partridge himself greatly discredits the claim made on Mrs. Partridge's behalf that the property conveyed to Mr. Paul was to be reconveyed upon the execution of the bankers' agreement which, as we have seen, had already been executed. Mr. Partridge appears to have transacted his business with Mr. Farrier and Mr. Paul and his counsel, Mr. Goldenhorn, under the controlling motive to get Mrs. Partridge's property in friendly hands where her creditors could not reach it, until her obligations were discharged and all else appears to have been of little importance in his view. When interrogated with reference to the three notes which were deposited with Mr. Dawson, Mr. Partridge testified:

"Well, I remember something about it, but I do not know anything more about it than the man in the moon. I remember something about it in an indistinct sort of way. I remember that Paul was to hold those notes."

Then follows this testimony:

"*Q.* You do not mean Paul?
"*A.* No, Dawson.
"*Q.* Do you know what the trust was that he was to hold them under?
"*A.* No, I do not.
 * * * * * * * * * *
"*Q.* Do you know why those notes were given to Dawson?
"*A.* I have not any clear idea or recollection of them; no."

Mr. Partridge does not undertake to testify or suggest that he repeated to Mr. Farrier the original proposition which he says he made to Mr. Edwards.

Mr. Partridge also testified that Mr. Mathewson drew the assignment, which is the basis of the claim of Woodhouse et al., and that he (Partridge) took it home where Mrs. Partridge

signed it, and thereupon he mailed it to Mr. Mathewson. Presumably, this instrument was drawn from information given by Mr. Partridge to Mr. Mathewson, and it will be observed that Mr. Partridge had abundance of opportunity to read and study the paper, and that the paper makes no reference to any trust, but states that the premises had been transferred by Mrs. Partridge to Paul "as security for and until certain obligations against my said husband, Charles R. Partridge, and myself as endorsers are discharged." This paper flatly contradicts the proposition that the deed to Paul was made as security merely until the bankers' agreement should be signed. The bankers' agreement did not "discharge" the obligation of Mr. and Mrs. Partridge as endorsers. Such discharge could only be effected when the Partridge Lumber Company paper should be paid by the operations of the Inter-State Lumber Company.

5. The question whether the obligations of Mr. and Mrs. Partridge upon paper held by the Lincoln Trust Company have in fact been discharged may, I think, be left without consideration. There is a mass of testimony bearing upon this question which is difficult to understand. The Lincoln Trust Company held $18,600 of paper upon which Mrs. Partridge was a party, about $2,000 of business paper which the Partridge Lumber Company had taken from its customers, and in addition to these amounts the Lincoln Trust Company had contributed about $15,000 of fresh money toward the purchase for $127,000 of the assets of the Partridge Lumber Company. The evidence is in an unsatisfactory condition in regard to the present status of these three classes of claims of the Lincoln Trust Company. I understand that a substantial portion of these sums of money has been repaid to the Lincoln Trust Company, but the evidence indicates that at least $980.83 remains unpaid. For all present purposes I think it is sufficient to find, as I do find, that when the sheriff's sale of the Montclair property was held in January, 1916, the Lincoln Trust Company had a *bona fide* claim to an interest in the property. I do not say that the result would not be the same if the Lincoln Trust Company at that time had been paid in full the entire indebtedness for which Mrs. Partridge was responsible.

6. If there had been no foreclosure suit, or if the foreclosure sale had yielded a surplus which was paid into court, it would be necessary to ascertain precisely what moneys or what obligations to pay money the deed from Mrs. Partridge to Mr. Paul actually secured. The fact that the conveyance was made with intent to defraud creditors has not been set up as a defence to the claim which Mrs. Partridge might have made and which Messrs. Woodhouse et al. as her successors in interest by way of mortgage are now making. No such ascertainment or accounting in my judgment is necessary, because of the fact that the Lincoln Trust Company acquired an absolute and unassailable title in fee to the premises by transfer from the Montclair Savings Bank.

It is most important, I think, to ascertain the precise relations *inter sese* of the Lincoln Trust Company, Mrs. Partridge and her successors in title, Messrs. Woodhouse et al., at the time of the foreclosure sale in January, 1916. All these parties were parties to the foreclosure suit; all had notice of the sale; all stood alike in respect of the opportunity to protect any interest which either of them had in the mortgaged premises and to make the mortgaged premises yield a surplus over and above the mortgage debt. All of these parties were absolutely foreclosed by the sale for $7,500. The Montclair Savings Bank had a vested right to receive a deed from the sheriff which would cut off forever any claim which the Lincoln Trust Company or Mrs. Partridge or Messrs. Woodhouse et al. could ever assert in respect of the mortgaged premises.

The Lincoln Trust Company had a right to make an agreement with the Montclair Savings Bank, to the effect that in case the savings bank bought in the property for less than the amount of its decree, it, the trust company, would pay the amount of the decree and take an assignment of the bid. The situation was substantially the same as if the trust company had bid the amount of complainant's decree, with costs. There was no outside bidder who was willing to bid the amount of the decree.

There are no circumstances in this case which support the theory that the Lincoln Trust Company bought in the property charged with a trust in favor of Mrs. Partridge or her assignees, Messrs. Mathewson and Harmon. It is unnecessary to discuss

the law pertaining to a covenant of assumption of a mortgage made by a second mortgagee or a party taking a deed absolute in form but in fact as security for the payment of money.

A discussion of this subject with citations of numerous authorities may be found in *2 Jones Mort. (7th ed.)* §§ *756 et seq.*

The Lincoln Trust Company in its pleading admits unconditionally that it assumed to pay the mortgage of the Montclair bank so as to indemnify Mrs. Partridge. All the questions pertaining to this covenant of assumption, assuming that it was originally binding upon Mr. Paul and the Lincoln Trust Company, are disposed of, I think, by the proposition that the Lincoln Trust Company in fact did indemnify Mrs. Partridge. The Lincoln Trust Company makes no claim upon the decree for over $10,000 upon which, according to the record, only $7,500 was paid. The Lincoln Trust Company did not take an assignment of the decree; it paid the decree so as to completely discharge Mrs. Partridge from the mortgage debt which she seems to have assumed when she purchased the mortgaged premises. Assuming that the Lincoln Trust Company was liable to Mrs. Partridge to effect her indemnification, all methods were open to the trust company to accomplish that result. It could either pay the decree or buy it from the Montclair Savings Bank and release Mrs. Partridge therefrom, or it could bid up the property at the sheriff's sale to the full amount of the decree and costs. The covenant of the Lincoln Trust Company was not to protect Mrs. Partridge's equity, but to protect Mrs. Partridge from liability for the mortgage debt.

The theory that the Lincoln Trust Company could not acquire this property by purchase from the Montclair Savings Bank, which acquired title at the sheriff's sale, involves the proposition that the Lincoln Trust Company was holding the equity of redemption in trust for Mrs. Partridge, or, to state the proposition more accurately, that there was actual trust and confidence in the relation established by the deed to Paul. We have seen that, at most, Mr. Paul and his principal, the Lincoln Trust Company, were merely dry trustees holding title primarily for the security of the Lincoln Trust Company. A man who accepts a deed absolute in form for the payment of money, conveying

property subject to a first mortgage which he assumes, certainly is not a trustee for the grantor in a sense which forbids him from attending the sheriff's sale in a suit to foreclose the first mortgage and buying in the property for his own benefit.

The claim of Messrs. Woodhouse et al. necessarily seems to lead to the result that the Lincoln Trust Company were bound to buy in the property, and more than that, to buy in the property for the benefit of Mrs. Partridge or her assignees. It has not been expressly argued that the Lincoln Trust Company was under any such extraordinary obligation, but it is claimed that the Lincoln Trust Company was in some mysterious manner disqualified from acquiring title for its own benefit, either from the sheriff or from the Montclair Savings Bank. If the Montclair Savings Bank had taken a deed from the sheriff, the further claim on behalf of Messrs. Woodhouse et al. would seem to follow that the Montclair Savings Bank could not sell the property to the Lincoln Trust Company. I see nothing in the evidence which restricted the market of the Montclair Savings Bank after it had acquired an absolute vested right to a deed from the sheriff as against all the parties to the suit, including Messrs. Woodhouse et al.

The soundness of the argument in favor of Messrs. Woodhouse et al. may be tested by considering the situation in case the Lincoln Trust Company had bid the full amount of the complainant's decree and costs and had taken title from the sheriff. As we have seen, at the start, it was not conceded by counsel of Messrs. Woodhouse et al. that the Lincoln Trust Company upon payment of the amount of the mortgage or the purchase of the mortgaged premises at the sheriff's sale would be subrogated to the rights of the Montclair Savings Bank. Subsequently, however, counsel for Messrs. Woodhouse et al. frankly admitted that such subrogation would be effected. What, then, would be the position of the Lincoln Trust Company? Is it not plain that the Lincoln Trust Company, being subrogated to the rights of the Montclair Savings Bank, would have had a right at once to proceed to have a second foreclosure suit in which the Montclair property would be subjected a second time to a sheriff's sale? There are no facts in this case which limit the right of the Lin-

coln Trust Company to foreclose its mortgage or lien acquired as above stated by subrogation. It has not been claimed that the Lincoln Trust Company was bound to buy this property in and then hold it for one year or for two years, or for ten years, for the benefit of Mrs. Partridge or her assignees.

It may be conceded that there is always an element of trust where a party accepts a deed absolute in form but actually intended as a security for money. The grantee in that case may not cheat the grantor by conveying the property to a *bona fide* purchaser who relies upon the absolute form of the deed. The obligations, however, of a grantee-mortgagee in such a case are extremely simple, and no one of those obligations was violated by Mr. Paul, Mr. Farrier or the Lincoln Trust Company. It is, I think, using the word "trust" in a misleading and illusory sense, when the charge is made that the Lincoln Trust Company stood at the sheriff's sale as trustee for Mrs. Partridge. When the property was conveyed to Mr. Paul, there was not present in the mind of Mr. Partridge, or any other party to the transaction, the slightest idea that Mr. Paul or the Lincoln Trust Company was assuming the duty of preventing a foreclosure of the first mortgage, or, in case of such foreclosure, of acquiring title and holding the same for some indefinite period for Mrs. Partridge's benefit or protection.

If, as the result of fire or storm and invalidity or insufficiency of insurance, the Lincoln Trust Company had met with a substantial loss as the result of its purchase of this property for over $10,000, would Messrs. Woodhouse et al., as beneficiaries, come to the relief of their so-called trustee? In fact, they stood by and allowed the property to be sold for less than the decree, and now when it turns out that the Lincoln Trust Company has made a substantial gain on resale of the property they seek to have the entire amount of the gain turned over to them.

7. There is a feature of this case, perhaps, sufficiently disclosed which, however, may well be made emphatic. The question whether the bankers' agreement had been fully executed so as to become operative when the deed to Paul was made, and the agreement and the notes were put in escrow with Mr. Dawson, has been the subject of some testimony, although finally, as above

4

stated, Mr. Robinson, who knew all the facts, positively testified
that that agreement was completed before June 27th, 1912, and
explained his reason for being certain in regard to this date. It
follows that if the so-called trust is correctly described in the
claim of Messrs. Woodhouse et al., Mr. Paul was under an abso-
lute obligation to reconvey the property to Mrs. Partridge imme-
diately after the deed was made to him, and this was the situa-
tion nearly a year later when Mrs. Partridge made her assign-
ment to Messrs. Harmon and Mathewson, upon which the repre-
sentatives of the estates of these gentlemen, Messrs. Woodhouse
et al., base their entire claim in this cause. For nearly a year,
therefore, we find that Mrs. Partridge made no claim for a recon-
veyance of the property and then she gave this instrument to
Messrs. Harmon and Mathewson, which they accepted and which
recites that the title to the Montclair property had been trans-
ferred by Mrs. Partridge "to George E. Paul as security for and
until certain obligations against my husband, Charles R. Part-
ridge, and myself as endorsers are discharged." The instrument
plainly indicates that the obligations secured by the deed to Mr.
Paul were yet to be discharged—*i. e.,* in the future. The lan-
guage of this assignment is, I think, inconsistent with the claim
that Mr. Farrier, on behalf of the Lincoln Trust Company, ac-
cepted a deed in trust to stand as security for a few days until
the bankers' agreement should be signed. On the contrary, the
language of the instrument indicates plainly that it was the dis-
charge of the obligation of Mr. and Mrs. Partridge under their
endorsements by actual payment of the paper which was in con-
templation.

8. An effort was made on behalf of Messrs. Woodhouse et al.
to show that the Montclair property was sacrificed at the sheriff's
sale. All claims growing out of the inadequacy of the price real-
ized at this sale were cognizable in this foreclosure suit. The
remedy of parties interested in an equity of redemption in a case
like this, is clearly defined in our law. No effort appears to have
been made to oppose the confirmation of the sale in this case.
Inasmuch as no effort was made to set aside the purchase effected
by the Montclair Savings Bank at its foreclosure sale in this suit,

in which such sale was made, the alleged inadequacy of the price realized at the sale, and the alleged sacrifice of the property, are matters which have no possible bearing upon the controversy between Messrs. Woodhouse et al. and the Lincoln Trust Company.

A decree will be advised establishing the title which the Lincoln Trust Company acquired from the Montclair Savings Bank as absolute and valid against all claims of Mrs. Partridge or her assignees, Messrs. Woodhouse et al., and dismissing the counterclaim of the last-named party.